311 F.2d 623
 Francis BEIDLER II, as sole surviving Director and Trustee
in Liquidation of, and suing by the name of Santee River
Cypress Lumber Company, and Mrs. Elizabeth Beidler Carton as
acting Codirector and co-trustee in the same, Appellees,
v.
Harry H. VENO, Appellant.
Harry VENO, Appellant,
v.
SANTEE RIVER CYPRESS LUMBER COMPANY, a Corporation in
Liquidation, et al., Appellees.
 No. 8661.
 United States Court of Appeals Fourth Circuit.
 Argued Oct. 5, 1962.
Decided Dec. 18, 1962.
 
 1
 deRosset Myers and Edward K. Pritchard, Charleston, S.C. (Marion F. Winter and Rembert C. Dennis, Moncks Corner, S.C., on brief), for appellant.
 
 
 2
 Thomas P. Stoney, Charleston, S.C. (Stoney & Stoney), Charleston, S.C., Lee & Moise, John D. Lee, Sumter, S.C., Mitchell & Horlbeck, and Frederick H. Horlbeck, Charleston, S.C., on brief), for appellees.
 
 
 3
 Before SOBELOFF, Chief Judge, BRYAN, Circuit Judge, and HUTCHESON, District Judge.
 
 
 4
 STERLING HUTCHESON, District Judge.
 
 
 5
 These actions were consolidated for trial because they involve the same subject matter. The first suit brought was the one filed by Harry Veno, Civil Action No. 6217 in the court below. That action was brought in the state court for specific performance of an alleged contract to convey plaintiff title to a tract of land. Harry H. Veno, defendant in Civil Action No. 6162 below is the same individual. He will be hereafter referred to as Veno. The defendants in Civil Action No. 6217 are Santee River Cypress Lumber Company, a corporation in liquidation hereinafter called the Lumber Company, its directors and trustees, the trustees under certain wills and all other persons unknown claiming any interest in or lien upon the real estate here involved.
 
 
 6
 The plaintiffs in Civil Action No. 6162 are the sole surviving trustees in liquidation of the same corporation and the acting co-director and co-trustees. That action was brought to quiet title to real estate and to enjoin Veno from interfering with rights of the plaintiffs. No. 6162 was brought under the diversity statute and No. 6217 was removed from the state court under that statute.
 
 
 7
 The consolidated actions were referred to a Standing Master who heard a number of witnesses and received in evidence many documents. On December 11, 1961, the Standing Master filed his report, in which he recommended that Veno have title to a portion of the tract of land in issue. On March 1, 1962, the District Judge, by order, set aside the Master's findings and reversed his conclusions. Veno appealed from that action.
 
 
 8
 A recital of the facts will reveal the correctness of the decision of the District Judge.
 
 
 9
 In 1906 the Lumber Company acquired 397 acres in Berkley County, South Carolina, referred to as the G. W. Singletary tract. This is primarily timber land, but there is a residence and a small amount of cleared land. The Lumber Company owned other tracts of land in the community. Veno's father lived on the Singletary tract, where he served as caretaker for many years. In 1927 Veno, with his family, moved to the place. Veno contends that he went into possession of the property under a written contract, executed on behalf of the Lumber Company by M. B. Cross, who managed its affairs in South Carolina. The alleged agreement is filed as Veno Exhibit No. 4, which purports to be a contract under which the Lumber Company agreed that in consideration of Veno moving upon the Singletary tract when he had continued as caretaker for a period of at least fifteen years, the Lumber Company would make a deed conveying the land to him in fee simple. But if Veno discontinued his services as caretaker within fifteen years the company would pay him $300.00 for each year in service and would be relieved of the agreement to convey the land to him. It further provided that the company would cut all timber twelve inches in diameter on the land. That document contains the name of M. B. Cross as manager for the Lumber Company and Harry H. Veno with the names of John H. Rudd, Jadie W. Adkins and Mamie I. Veno as witnesses. Beginning on January 1, 1938, and continuing thereafter through 1943, Veno entered into written agreements with Mr. Cross, as manager of the Lumber Company, under which he agreed that in consideration of occupying the residence and farming the open land on the Singletary tract he would police all lands of the Lumber Company in Berkley County, South Carolina, consisting of eleven separate tracts. His duties were to prevent trespassing and injury to the property, to see that the land was posted, to prevent depredation and to control forest fires. When fires were discovered he was to secure necessary help for putting them out, for which service additional compensation would be paid him and those assisting him by the Lumber Company at an amount to be agreed upon. He was also to report to the Lumber Company the name or names f persons responsible for the fire, if obtainable, and was to take care of the fire fighting equipment supplied by the company and to deliver it to the Lumber Company at the end of the lease. The forms of these leases were not identical but in substance they were similar. For awhile one L. J. Weatherford was named as Assistant Caretaker. This arrangement continued through the year 1943, during which time M. B. Cross was manager of the property. Mr. Cross then died and on April 8, 1944, Veno wrote a letter to Mr. John D. Lee, then in charge of the land owned by the Lumber Company in Berkley County. In that letter, Lumber Company's Exhibit No. 2, Veno stated that for the last twenty years he had been in charge of all lands owned by the company in Berkley County under an arrangement with Mr. Cross. He requested Mr. Lee to call at his place, stating that he had been negotiating with Mr. Cross when he died regarding the purchase of the G. W. Singletary tract. On April 26, 1944, the company wrote Veno requesting certain information regarding its holding in Berkley County. On April 28th Veno wrote a letter to Mr. Francis Beidler, the sole surviving trustee in liquidation, in which he referred to having talked with Mr. Cross about buying the land and that Mr. Cross seemed to be interested in helping him to get it. He repeated his desire to buy the tract and requested the lowest figures on it. On May 5, 1944, Veno wrote the company supplying certain information concerning the lands requested in the letter of April 26th. On May 8, 1944, the company advised him thatit did not desire to dispose of the property. In 1950, for the first time, the Lumber Company was notified through attorneys that Veno claimed the G. W. Singletary tract under the contract and agreement dated November 1, 1927, files as Veno Exhibit No. 4. Having had no previous intimation of such agreement, the company requested that a copy be sent to it. In this they secured the services of Mr. Norvell Newall, an attorney. Veno contends that Mr. Newall, in his absence, obtained from Mrs. Veno Veno's copy of the contract. Mr. Newall has since died and accordingly cannot testify. Veno further contends that after the contract was delivered to Newall, Newall came to see him and each of the witnesses and had them sign copies which Mr. Newall had made from the original and at a later date Newall returned to Veno the document filed as Exhibit No. 4. As stated, Newall is dead, but his former secretary testified from her original notes dictated by him on January 29, 1952, as to the contents of a letter to John D. Lee, in which Mr. Newall advised Mr. Lee that he had been in the office of Mr. Marion Winter, a practicing attorney, by whom he was told that Veno had this written contract but that it was then in the possession of Mr. Rembert C. Dennis, another attorney. Continuing, the letter stated that Mr. Newall had mentioned the matter to Mr. Dennis who said he had a letter from Mr. Lee requesting copy of the contract; that the contract was in Mr. Winter's office, but he would get it and provide copies. Mr. Lee later on the same morning was in Mr. Winter's office and offered to have his secretary copy the contract. Mr. Winter told him he did not know just where to put his hand on the file but he would have his stenographer make a copy within a few days. On June 13, 1951, Mr. Newall wrote Messrs. Lee and Moise, counsel for the Lumber Company, enclosing copy of contract handed him by Mr. Winter. On June 21, 1951, Mr. Newall wrote Mr. Lee in reply to an inquiry that he did not see the original Veno contract and that he did not know Mr. Cross' signature. He suggested that Mr. Lee examine the original in Mr. Winter's office. From the testimony of Mr. Lee, this point may be briefly summaried by saying he experienced a delay of months in obtaining an opportunity to examine the contract. It is the contention of Veno that Exhibit No. 4 is the document returned to him by Newall.
 
 
 10
 Veno and the witnesses whose names appear testified that Newall obtained their signatures to what he represented as a copy. In support of his contention of the existence of this contract, Veno has called the witnesses who testified to having signed the original instrument in 1927. At that time Jadie W. Adkins had not yet reached the age of eleven. He testified that the agreement was signed around 11 or 12 o'clock. John H. Rudd testified to signing the paper in 1927, as did Mrs. Veno. Actually, the present Mrs. Veno in 1927 was the wife of Peter Morris and she did not become Mrs. Veno until after 1927. Her last Morris child was born in January, 1930. In addition to the witnesses to the paper, Mr. Marion Winter testified. Mr. Winter is one of the counsel for Veno. He testified that while it had escaped his recollection, during the testimony of one of the witnesses, Mr. Veno, remarked that he, Winter, had been present and seen the contract signed. Mr. Winter could not then fully recall it, but in the examination of another witness, testimony developed which recalled the circumstances to his memory very vividly. He remembered that he went to the home of Veno on the day in question driving a Model T Ford automobile with the side curtains up, that the sun was shining and he had not taken down the curtains. He stopped at the edge of a little road with a tree on the left and opened the door on the left side. He described in detail the position of Mr. Cross while talking with Harry Veno. He then saw Veno get up from his seat in a swing, sit down and apparently sign one paper and then apparently sign another paper. A young lady sitting in the other end of the swing apparently signed both papers, as did Mr. Rudd. After the young woman left the porch Mr. Cross called, 'Mrs. Mamie, you didn't sign your right name', and someone said she had gone in the house. Mr. Cross then remarked that someone else would do and marked that someone else would do and marked that he was not twenty-one years old. Mr. Cross replied that made no difference. The woman thereafter returned from the house and offered to sign her name as Mrs. Morris, but Mr. Cross said it was not necessary. Cross then spoke to Winter inquiring concerning his mother and referring to his cousin, Dan, and then proceeded to say that if Veno stayed with him awhile he would own this place. Mr. Cross then explained in detail to Veno why the contract was headed Charleston instead of Berkley County, saying he had expected to meet Veno in Charleston.
 
 
 11
 In explanation of the contracts of rental subsequently entered into, Veno denies having signed some of them, saying that his name was signed by his wife, although he admits that she often did his writing for him. Mr. Winter testified that he gave the original contract to Mr. Newall in 1952, or possibly 1951, and he did not see it again until it was shown him by Veno. Without considering the evidence further, it suffices to say that it was conceded by Veno and his counsel that the document upon which Veno bases his claim is a forged instrument. They admit they knew it was forged before suit was brought. This admission was made during the taking of testimony and after a handwriting expert, brought from a distance, had twice testified that the signature on Exhibit No. 4 is not the true signature of M. B. Cross. In explanation of why Veno relied upon the document as a true document, Winter testified that Veno told him that Newall told Veno its genuineness would never be questioned. Upon this assurance Mr. Winter proceeded as though the document was genuine.
 
 
 12
 Without pursuing the matter further, although only a portion of this highly unsatisfactory evidence has been discussed, it is our opinion that the District Judge was clearly right inb setting aside the holding of the Master. It seems obvious that the Standing Master became confused in his conclusion of law dealing with the burden of proof in a case such as this. The general rule which is the law in South Carolina is that to enforce a claim for specific performance, the facts essential to a recovery must be established by a high degree of proof which has been variously characterized by such terms as 'clear', 'clear and convincing', and 'clear and satisfactory'.
 
 
 13
 The proof in this case falls far short of meeting the requirement.
 
 
 14
 We are mindful of the importance to be attached to the findings of the tribunal before whom the witnesses testified. Those findings should have great weight. However, the demeanor and appearance of the witneses in this case must be weighed against the strange, almost incredible, recital of their testimony, which, viewed in the most favorable light, falls far short of being 'clear', 'convincing', or 'satisfactory'.
 
 
 15
 In support of our belief that the Standing Master became confused in his findings is that he reported Veno should be allowed, not the G. W. Singletary tract of 397 acres (which is the only quantity of land involved here) but in this suit for specific performance the Standing Master recommends that under a claim on quantum meruit for services performed, he should be allowed of the cleared land, with the buildings and fences, not exceeding 100 acres. He apparently overlooked the fact that if Veno is not entitled to specific performance of the contract to convey title to the entire 397 acres and falls back upon a claim of quantum meruit he is confronted with the documentary proof of the contracts, some signed by himself and others, as he alleges, signed by his wife under which he contracted to act as caretaker in return for the use of the land, whose ownership by the Lumber Company he recognized. This continued from 1938 through 1943. In 1944, after the death of Mr. Cross, Veno communicated with the Lumber Company. That communication related to his desire to purchase the land.
 
 
 16
 Equally strange is the fact that Exhibit No. 4 was relied upon only after the death of Mr. Newall.
 
 
 17
 This is of further significance as throwing light upon the entire case. If Veno had such a contract as he now alleges, when he approached the Lumber Company to purchase the land in 1944 he had, two years earlier, acquired the right to a deed conveying title to him. Equally strange is the fact that after being informed the Lumber Company did not desire to sell, he waited until 1950, six years later, to notify them of his alleged contract.
 
 
 18
 The judgment of the trial court is correct and the case is
 
 
 19
 Affirmed.